UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUA CHEN and YU YUN ZOU, and others
similarly situated,

                                Plaintiffs,

        -v-

HONGHUI SHI,

                                Defendant.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/24/11

No. 09 Civ. 8920 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

        Plaintiffs initiated this action by filing a Complaint on October 22, 2009, alleging that

Defendant Honghui Shi conspired to promote torture, genocide, and various human rights abuses

during his tenure as Secretary of the Chinese Communist Party Committee and Director of the

Bureau of Reeducation through Labor of Guangdong Province.  Plaintiffs seek compensatory

and punitive damages pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350, and the Torture

Victims Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1991).

        Although Defendant did not formally appear in this action, the Court received a letter

dated December 16, 2009 from the Embassy of the People's Republic of China to the U.S.

Department of State, requesting that this action be dismissed.  By Order dated December 17,

2009, the Court ordered Plaintiffs to show cause why the action could proceed notwithstanding

the Foreign Sovereign Immunities Act.  This action was subsequently stayed pending the

Supreme Court's resolution of *Samantar v. Yousuf*, 130 S. Ct. 2278 (2010).  Following the

*Samantar* decision, the Court ordered Plaintiffs to show cause no later than July 9, 2010 why this

action should not be dismissed under the common law of sovereign immunity; this deadline was

subsequently extended until August 23, 2010.  Upon receipt of Plaintiffs' submission, the Court

ordered that should Defendant or the Chinese Embassy wish to make a submission in opposition, such submission would be due no later than October 1, 2010. The Court is now in receipt of (1) the attached letter from the Chinese Embassy dated September 14, 2010; (2) the attached letter from the Chinese Embassy dated September 28, 2010, which includes a memorandum of law by the Chinese Society of Private International Law; and (3) a notice of supplemental authority from Plaintiffs dated October 21, 2010.

In light of the immunity issue raised in this action, the Court finds it appropriate to invite the U.S. Department of State to provide its views, if any, on the application of common law immunity to Defendant. *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2292 (2010) ("Even if a suit is not governed by the [Foreign Sovereign Immunities] Act, it may still be barred by foreign sovereign immunity under the common law."). If the Department of State does not file a statement of interest by August 8, 2011, or otherwise indicates to the Court that it declines to submit a statement of interest in this case, the Court will proceed to resolve the immunity issue on the existing submissions.

Dated:      June 23, 2011
            New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

Copies of this Order have been mailed to:

Hua Chen
229 W. 28th Street
Suite 1200
New York, NY 10001

Yu Yun Zou
229 W. 28th Street
Suite 1200
New York, NY 10001

Embassy of the People's Republic of China
3505 International Place, N.W.
Washington, D.C. 20008

David Jones
United States Attorney's Office
Southern District of New York
david.jones6@usdoj.gov



中 华 人 民 共 和 国 大 使 馆

EMBASSY OF THE PEOPLE'S REPUBLIC OF CHINA

3505 International Place, N.W. Washington, D.C. 2000



RECEIVED

SEP   7 2010

CHAMBERS OF
RICHARD J. SULLIVAN
U.S.D.J.

CE114/10

The Embassy of the People's Republic of China presents its compliments to the Department of State of the United States of America and has the honor to draw the attention of the latter to an unwarranted lawsuit filed by the Falun Gong activists in the US District Court for the Southern District of New York (*09 CV 8920*) against Mr. Shi Honghui, Director of the Bureau of Education through Labor of Guangdong Province, and Chairman of Drugs Addiction Treatment Research Committee of the China Society of Education through Labor.

The Chinese side has made clear its positions on the case involving Mr. Shi Honghui in Note CE155/09, which points out that according to the principle of sovereign immunity provided in international law, US courts have no jurisdiction over the case. Given that the case is yet to be resolved properly and "Falun Gong" keeps trying to maintain the case, the Chinese side hereby would like to state its positions again as follows:

Sovereign immunity is an important principle provided in international law and has been universally accepted in the world. According to this principle, a state and its officials who perform official duties on behalf of the state within its territory are exempted from jurisdiction of any court of another state, unless the state explicitly waives its jurisdictional immunity. Sovereign immunity is based on sovereign equality among states and plays a key role in ensuring normal exchanges between states and maintaining peaceful and stable international relations.

The Chinese government has outlawed the "Falun Gong" cult in accordance with the Chinese laws and has taken actions to deal with those people who engage in illegal activities. In doing so, China is exercising its sovereignty. According to the principle of sovereign immunity, the above mentioned actions are not subject to judicial jurisdiction of US courts. This immunity also applies to officials of the Chinese government who are performing their official duties.

Mr. Shi Honghui, Director of the Bureau of Reform through Labor of Guangdong Province, is an official of the Chinese government. He is performing his official duty entrusted to him by law in managing the system of education through labor in Guangdong Province. Consequently, his actions in managing that system are entitled to sovereign immunity and are not subject to the jurisdiction of any US court. A lawsuit against this official's managing that system would be equivalent to a lawsuit against China itself.

Sovereign immunity is an important and universally accepted principle of international law. The United States also recognizes and accepts this principle. Therefore, regardless of the domestic institutions and ways through which the principle of sovereign immunity is applied in the United States, the sovereign immunity enjoyed by the government and officials of other states should be duly respected and upheld. According to international law, the US government has the obligation to take measures to ensure that the sovereign immunity enjoyed by the Chinese government and officials is duly upheld in US courts.

The Chinese side hereby reiterates that the Chinese government has acted in strict compliance with the law in handling the issue of "Falun Gong" and ensuring the lawful rights of the people involved. There is no so-called "torture" or "persecution" whatsoever. The "Falun Gong" followers in the United States have vilified the Chinese government of torturing and persecuting "Falun Gong" practitioners. Their allegations are groundless.

The Chinese side again stresses that the "Falun Gong" cult has filed an unwarranted lawsuit against Mr. Shi Honghui with fabricated charges. Their purpose is to defame China, disrupt the normal exchanges between officials of China and the United States and sabotage China-US relations. The Chinese side hopes that the US side could respect the principles of international law, fulfill its due obligations under international law, bear in mind the overall China-US relations, and take immediate and credible actions to urge the US court to dismiss the unwarranted lawsuit by "Falun Gong" against Mr. Shi Honghui.

The Embassy of the People's Republic of China avails itself of this opportunity to renew to the Department of State of the United States of America the assurances of its highest consideration.

Washington, D.C., September 14, 2010

The Department of State
The United States of America
Washington, D.C.



中 华 人 民 共 和 国 大 使 馆

EMBASSY OF THE PEOPLE'S REPUBLIC OF CHINA

3505 International Place, N.W. Washington, D.C. 2000

RECEIVED
SEP 30 2010

CHAMBERS OF
RICHARD J. SULLIVAN
U.S.D.J.

CE 117/10

The Embassy of the People's Republic of China presents its compliments to the Department of State of the United States of America and has the honor to draw the attention of the latter to an unwarranted lawsuit filed by the Falun Gong activists in the US District Court for the Southern District of New York (*09 CV 8920*) against Mr. Shi Honghui, Director of the Bureau of Education through Labor of Guangdong Province, and Chairman of Drugs Addiction Treatment Research Committee of the China Society of Education through Labor.

The Chinese side has made clear its principled position on the unwarranted lawsuit filed by "Falun Gong" against Mr. Shi Honghui in its Notes CE155/09 dated December 16 2009 and CE114/10 dated September 14 2010. It hereby would like to provide the following additional information:

Mr. Shi Honghui is an official of the Chinese Government. In September 2009, he paid a visit to the United States in his official capacity at the invitation of the Office of the Mayor of San Francisco and later went to New York for official events on counter-narcotics.

Attached is a Memorandum issued by Chinese Society of Private International Law on some legal issues regarding this case.

The Embassy of the People's Republic of China avails itself of this opportunity to renew to the Department of State of the United States of America the assurances of its highest consideration.

Washington, D.C., September 28, 2010

The Department of State
The United States of America
Washington, D.C.

**MEMORANDUM OF
CHINESE SOCIETY OF PRIVATE INTERNATIONAL LAW
ON PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE
WHY THIS ACTION SHOULD NOT BE DISMISSED
UNDER THE COMMON LAW OF SOVEREIGN IMMUNITY
IN *HUA CHEN & ZOU YUYUN V. SHI HONGHUI*, 09 CV 8920 (S.D.N.Y.)**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

I.      DIRECTOR SHI HONGHUI IS ENTITLED TO COMMON-LAW
        FOREIGN OFFICIAL IMMUNITY. ................................................................. 4

II.     THE LAWSUIT IS BASED UPON ALLEGED ACTIONS UNDERTAKEN BY
        DIRECTOR SHI ACTING IN HIS OFFICIAL CAPACITY. ............................. 9

III.    THE CASE IS BARRED BY THE ACT OF STATE DOCTRINE. ................... 18

IV.     THE COURT IN ANY EVENT SHOULD DECLINE JURISDICTION OVER
        THE CASE IN THE INTEREST OF INTERNATIONAL COMITY. ............... 19

V.      THE CLAIMS ALLEGED DO NOT FALL WITHIN THE CLASS OR
        OFFENSES RECOGNIZED BY THE ALIEN TORT STATUTE OR THE
        TORTURE VICTIM PROTECTION ACT. ....................................................... 22

VI.     THE COMPLAINT MUST BE DISMISSED IN ANY EVENT UNDER THE
        STANDARDS OF *TWOMBLY* AND *IQBAL* ................................................. 26

CONCLUSION ................................................................................................................. 29

i

## TABLE OF AUTHORITIES

Page

CASES

*Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S.Ct. 1937 (2009)...................................3, 16, 17, 26-28

*Bancoult v. McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004) ......................................................13, 16

*Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006) ..........................................................14, 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................3, 16, 26-28

*Bogopa Serv. Corp. v. Shulga*, 2009 U.S. Dist. LEXIS 48469 (W.D.N.C. June 10, 2009) .........28

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990) .............................................16

*De Lotta v. Dezenzo's Italian Rest., Inc.*, 2009 U.S. Dist. LEXIS 110257
    (M.D. Fl. Nov. 24, 2009)....................................................................................................28

*Doe v. Liu Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004)...........................................................*passim*

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) ...............28

*Hafer v. Melo*, 502 U.S. 21 (1991) ...................................................................................................4

*Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008)............................................................15, 16

*Heaney v. Gov't of Spain*, 445 F.2d 501 (2d Cir. 1971)...................................................................5

*Herbage v. Meese*, 747 F. Supp. 60 (D.D.C. 1990)........................................................................7

*Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767 (9th Cir. 1996)..............................................22

*Hilton v. Guyot*, 159 U.S. 113 (1895)............................................................................................19

*In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493 (9th Cir. 1992) ...........10

*In re Estate of Ferdinand E. Marcos, Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994) ..........10

*In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ...........................4, 11

*In re South African Apartheid Litigation*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009).........................25

*Jones v Ministry of the Interior of the Kingdom of Saudi Arabia,*
[2006] UKHL 26, [2007] 1 AC 270 (2006) ........................................................................ 6

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) ............................................................................ 11

*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. N.Y. 2007) .................................. 26

*Li Weisum v. Bo Xilai*, Memorandum Opinion, 1:04-cv-00649-RJL (D.D.C.),
(docket #27) .......................................................................................................... 2, 17, 20, 22

*Matar v. Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y. 2007) ................................................ 6, 8, 10, 11

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) .............................................................................. 10

*Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997) .................................................. 10

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000) .......................... 28

*Prosecutor v. Bagilishema* (Trial Chamber ICTR, June 7, 2001) ........................................... 23, 24

*Prosecutor v. Blaskic*, 110 I.L.R. 607 (1997) ............................................................................... 6

*Prosecutor v. Ntakirutimana* (Trial Chamber ICTR, Feb. 21, 2003) ........................................... 24

*Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008) ......................................................... 12, 14, 15, 16

*Regina v. Bow Street Magistrate (No. 3) Ex parte Pinochet*, [2000] 1 App. Cas. 147
(Eng. 1999) ................................................................................................................ 12, 19

*Samantar v. Yousuf*, ___ U.S. ___, 130 S.Ct. 2278 (2010) ........................................................ 1, 4

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ............................................................................... 7

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ...................................................... 11, 14, 16

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ...................................................................... *passim*

*Underhill v. Hernandez*, 168 U.S. 250 (1897) .......................................................................... 5, 18

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400 (1990) ....................... 18

*Wynne v. Birach*, 2009 U.S. Dist. LEXIS 102276 (E.D. Va. Nov. 3, 2009) ................................. 28

*Youming Jin v. Ministry of State Security*, 557 F. Supp. 2d 131 (D.D.C. 2008) ............................ 1

STATUTES AND RULES

Alien Tort Statute, 28 U.S.C. § 1350......................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ................................................................................................28

Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ........................................13

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-1611 ........................4, 6, 16, 18, 20

Torture Victim Protection Act, 28 U.S.C. § 1350 note ............................................*passim*

Westfall Act, 28 U.S.C. § 2679(d)(1)............................................................................12

28 U.S.C. § 1605(a)(5)(A)............................................................................................16

28 U.S.C. § 1605(a)(5)(B)............................................................................................16

28 U.S.C. § 2680(a)......................................................................................................16

28 U.S.C. § 2680(h)......................................................................................................16

MISCELLANEOUS

*Amicus Curiae* Brief of the United States in *Samantar v. Yousuf*, 2008 U.S. Briefs 1555,
    2010 U.S. S. Ct. Briefs LEXIS 78 (Jan. 27, 2010)..........................................5, 6

C. Bradley & J. Goldsmith, "Foreign Sovereign Immunity and Domestic Officer Suits,"
    13 Green Bag 2d 137 (Winter 2010) ...................................................................5

Commentary to Draft Articles on the Responsibility of States for
    Internationally Wrongful Acts (2001) ...................................................................8

Communication CE155/09 of the Embassy of the People's Republic of China ...............10, 12

Defendants' Notice of Supplemental Authority (July 26, 2005) in *Rasul v.
    Rumsfeld*, No.: 1: 04cv01864-RMU (D.D.C. ) (docket #21)............................14

Draft Articles on the Responsibility of States for
    Internationally Wrongful Acts (2001) art. 7........................................................8

Greg R. Vetter, *Command Responsibility of Non-Military Superiors in the International
    Criminal Court (ICC)*, 25 Yale J. Int'l L. 89, 122 (2000).................................24

Letter from Legal Adviser of Department of State to  Assistant Attorney General
(Aug. 3, 2004), *attached to* Statement of Interest of the United States in
*Doe v. Liu Qi*, No. C 02 0672 CW (EMC) (N.D. Cal.) (docket #94)
(Aug. 4, 2004)............................................................................................................9, 21, 22

Letter from Legal Adviser of Department of State to  Assistant Attorney General
(Sept. 25, 2002), *attached to* Statement of Interest of the United States in
*Doe v. Liu Qi*, No. C 02 0672 CW (EMC) (N.D. Cal.) (docket #94)
(Aug. 4, 2004)............................................................................................................3, 18, 21

Response of the United States to Plaintiffs' Supplemental Submission (June 30, 2008), in
*Li Weisum v. Bo Xilai*, 1:04-cv-00649-RJL (D.D.C.) (docket #26) ...................................17

Rome Statute of the International Criminal Court (ICC) (July 17, 1998)..........................24, 25, 26

S. Hrg. 1-1-1284 on S. 1629 and H.R. 1662 (June 22, 1990).........................................................29

S. Rep. No. 249, 102d Cong. 1st Sess. (1991) .........................................................................18, 26

Statement of Interest of United States in *Matar v. Dichter* (November 17, 2006),
1:05-cv-10270-WHP (S.D.N.Y.) (docket #36)..................................................................6, 7

Suggestion of Immunity and Statement of Interest of the United States (July 24, 2006)
in *Li Weisum v. Bo Xilai*, 1:04-cv-00649-RJL (D.D.C.) (docket #16-1).......................2, 20

## INTRODUCTION

This memorandum has been prepared by the Chinese Society of Private International Law[1] to analyze Plaintiffs' Response to Court's Order to Show Cause Why This Action Should Not Be Dismissed Under the Common Law of Sovereign Immunity ("Response") in *Hua Chen & Zou Yuyun v. Shi Honghui*, 09 CV 8920 (S.D.N.Y.). The Response claims that in light of *Samantar v. Yousuf*, ___ U.S. ___, 130 S.Ct. 2278 (2010), the defendant Chinese official, Shi Honghui, does not enjoy common-law official immunity from suit. For the reasons set forth below, the plaintiffs' claims are incorrect. The action should be dismissed for multiple reasons.

Plaintiffs are adherents to a cult that they acknowledge has been outlawed in China. Their Complaint assails various alleged actions in China against Falun Gong adherents by the Chinese state, including the (former) head of state Jiang Zemin (Complaint ¶¶ 42, 45); the Public Security Bureau (¶ 47); the Ministry of Civil Affairs (¶ 48); the Chinese Central Government's General Office and the State Council's General Office (¶ 49); and other elements of the Chinese state. In 2009, a Chinese official, Shi Honghui, was visiting New York. The plaintiffs apparently hand-served Mr. Shi with a Complaint styled as a class action, based on alleged violations of Shi's official supervisory and management responsibilities in Guangdong Province of China. Specifically, they allege that the defendant Shi was at the times relevant to the Complaint and is the Director of the Bureau of Reeducation through Labor of Guangdong Province and Superintendent of Labor Reeducation through Labor Association of Drugs Resistant Research Committee, and, co-extensively, was and is the Secretary of the Chinese Communist Party Committee of Guangdong Province in the People's Republic of China

---

[1]     The Society has previously expressed its views in another U.S. case of interest to it, in *Youming Jin v. Ministry of State Security*, 557 F. Supp. 2d 131 (D.D.C. 2008). *See id.* at 135-138.

1

("PRC"). Complaint ¶ 54. They allege that Director Shi "uses his position illegitimately" and is "directly and ultimately responsible for the abuses of arbitrary detention, torture and execution as a result of torture, that took place under his supervision of the RTL [Reform through Labor] system in Guangdong Province." Complaint ¶ 58.

Large portions of the Complaint in this case have been copied over from a complaint filed in the U.S. District Court for the District of Columbia against another Chinese official, Bo Xilai, *Li Weisum v. Bo Xilai*, D.D.C. 1:04-cv-00649-RJL. *Compare, e.g.*, Complaint ¶ 62 *with Bo Xilai* complaint (docket entry #1) ¶ 19 ("Since that time, on the national level . . . ."); Complaint ¶ 65 *with Bo Xilai* complaint ¶ 26 ("The following specific abuses, constituting torts involving the most serious forms of intentionally inflicted physical and mental suffering and injury, were inflicted upon the plaintiffs as a direct result of the actions of the Defendant and those with whom he acted in concert to carry out the officially sanctioned and mandated policy of persecuting, punishing and intimidating Falun Gong practitioners . . . ."); etc. As the United States noted in a Statement of Interest it filed in the *Bo Xilai* case, the plaintiffs' complaint did "not allege that Minister Bo personally abused anyone," but made highly generalized and conclusory claims about Bo Xilai's management and supervisory power and authority over unnamed officials who are alleged to have harmed plaintiffs, and "focuses on 'the policies and practices of the Defendant and other high-level government officials." Suggestion of Immunity and Statement of Interest of the United States (July 24, 2006) at 3 (docket entry #16-1).[2]

Before the *Bo Xilai* case, there were two cases against the officials Liu Qi and Xia Deren. *See Doe v. Liu Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004). The Legal Adviser of the Department

---

[2]    The *Bo Xilai* case was dismissed on August 1, 2008. The defendant official in that case was completely immune from service at the time service was attempted on him, having been in the United States on a special mission, to attend a meeting of the U.S.-China Joint Commission on Commerce and Trade (JCCT). *See* Memorandum Opinion in *Bo Xilai* (docket entry #27).

of State stated in a letter placed on the docket of the court in the *Liu Qi* case that "this is one of a series of suits in U.S. courts against Chinese officials for actions allegedly taken against Falun Gong practitioners.  This pattern may reinforce the inference from the complaint that, at bottom, this suit is directed at PRC government policies rather than past conduct of a specific official."  Letter of Legal Adviser of the Department of State to Assistant Attorney General (Sept. 25, 2002) at 4 n.3, *attached to* Statement of Interest of the United States in *Doe v. Liu Qi*, No. C 02 0672 CW (EMC) (N.D. Cal.) (docket #94) (Aug. 4, 2004).

The Complaint in this case is the latest attack by plaintiffs on the policies and practices of the Chinese state, in this case tacking on generalized allegations of liability against a specific official, Director Shi.  The opportunity to launch this particular attack on China's policies came about when this particular Chinese official visited New York.

The Complaint establishes that Director Shi was acting in his official capacity, and China has claimed immunity for Director Shi.  Consequently, he enjoys common-law immunity from suit.  The act of state doctrine also bars the suit, and comity would counsel against entertaining jurisdiction in any event.  Moreover, the Complaint is defective in that it fails to state cognizable claims under the Alien Tort Statute ("ATS") or Torture Victim Protection Act ("TVPA"), and its allegations in any event fail to meet the pleadings standards enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S.Ct. 1937 (2009).[3]

---

[3]     Solely for the purposes of the legal analysis undertaken here, the allegations of the wrongs suffered by plaintiffs are treated as if they were true.

3

**ARGUMENT**

## I.   DIRECTOR SHI HONGHUI IS ENTITLED TO COMMON-LAW FOREIGN OFFICIAL IMMUNITY.

In *Samantar v. Yousuf*, ___ U.S. ___, 130 S.Ct. 2278 (2010), the U.S. Supreme Court ruled that the source of a foreign official's immunity derives from the common law, not from the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. As this Court noted in its Order to Show Cause, the Second Circuit had already observed, before the *Samantar* decision was handed down, that the pre-FSIA common law "expressly extended immunity to individual officials acting in their official capacities." *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 83 (2d Cir. 2008) (internal quotation marks omitted).

The plaintiffs contradict the Second Circuit's observation and argue that it makes no difference whether the alleged actions for which Director Shi is being sued were undertaken in his official capacity, or in his personal capacity. They argue that "the critical factor in determining when a suit against an official can be equated with a suit against the state [which would be a case in which the official is immune] is **not** the capacity in which the official acted . . . , but the **capacity in which he is sued**." Response at 14 (paraphrasing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)) (emphasis added). As will be shown below, this claim is the diametrical opposite of the position of the United States Government on the common-law immunity of foreign officials, and is the diametrical opposite of the position of all international law authorities on the entitlement to immunity of such officials under international law.

Plaintiffs do not make this claim by way of relying on *Samantar*. The *Samantar* opinion clearly stated that "we need not and do not resolve the dispute among the parties as to the precise scope of [a foreign] official's immunity at common law." *Id*. at 2290. Instead, plaintiffs make their claim by deliberately conflating the common-law immunity of foreign officials with the

4

common-law immunity of U.S. domestic officials. These are, however, two completely different immunity regimes. As Professor Curtis Bradley at Duke Law School and Professor Jack Goldsmith at Harvard Law School have observed, the common-law immunity regimes for these two classes of officials differ quite widely, in that there is "qualified immunity that domestic executive officials receive for their official acts," while "what is in effect an absolute immunity [is] accorded to foreign officials for their official acts." C. Bradley & J. Goldsmith, "Foreign Sovereign Immunity and Domestic Officer Suits," 13 Green Bag 2d 137, 147 (Winter 2010). "Unlike the common law immunity regime applicable to domestic officials, at common law in both Great Britain and the United States, suits against foreign officials for their official acts were considered suits against the foreign state and thus were subject to the state's immunity." *Id.* at 141. "For hundreds of years in both Great Britain and the United States, courts accorded broader immunity in foreign officer suits than in domestic officer suits. There is no indication in any of the relevant statutes that Congress has attempted to override this common law backdrop." *Id.* at 151. Indeed, besides enunciating the classic expression of the act of state doctrine, in *Underhill v. Hernandez*, 168 U.S. 250 (1897), the Supreme Court specifically recognized as a matter of common law "[t]he immunity of individuals from suits brought in foreign tribunals for acts done within their own States, in the exercise of governmental authority, whether as civil officers or as military commanders." 168 U.S. at 252. *See Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971). Thus, plaintiffs' reliance on a line of civil rights cases against U.S. domestic officials is completely misplaced.

In fact, the common law of foreign-official immunity does **not** derive from the civil rights cases against U.S. domestic officials, but from "Executive Branch principles, which are informed by customary international law and practice." *Amicus Curiae* Brief of United States in

5

*Samantar*, 2008 U.S. Briefs 1555; 2010 U.S. S. Ct. Briefs LEXIS 78 (Jan. 27, 2010). Under

such principles, "the immunity of foreign officials arises from the official character of their acts."

*Id.* This has been repeatedly confirmed by the U.S. Executive Branch. In a case in this Court,

*Matar v. Dichter*, S.D.N.Y. 1:05-cv-10270-WHP, the United States in a Statement of Interest

(docket #36, Nov. 17, 2006) explained:

> Like U.S. law, customary international law has long recognized that foreign officials
> enjoy civil immunity for their official acts. As explained by the Appeals Chamber of
> the International Criminal Tribunal for the Former Yugoslavia:
>
>> Such officials are mere instruments of a State and their official function can only
>> be attributed to the State. They cannot be the subject of sanctions or penalties for
>> conduct that is not private but undertaken on behalf of a State. In other words,
>> State officials cannot suffer the consequences of wrongful acts which are not
>> attributable to them personally but to the State on whose behalf they act; they
>> enjoy so-called "functional immunity." This is a well-established rule of
>> customer international law going back to the eighteenth and nineteenth centuries,
>> restated many time since.
>
> *Prosecutor v. Blaskic* (*Issue of subpoena duces tecum*), 110 I.L.R. 607, 707 (1997)
> (citing cases).
>
> These principles have been applied in several significant foreign jurisdictions, some
> with immunity statutes that, like the FSIA, make no mention of individual officials.
> Thus, most recently, the House of Lords recognized immunity from civil suit for
> official-capacity acts even though the United Kingdom's immunity statute did not
> "expressly provide[ ] for the case where suit is brought against the servants or agents,
> officials or functionaries of a foreign state"; the court reasoned that "[t]he foreign
> state's right to immunity cannot be circumvented by suing its servants or agents."
> *Jones v Ministry of the Interior of the Kingdom of Saudi Arabia*, UKHL 26, ¶ 10 (House
> of Lords, United Kingdom 2006).

Statement of Interest of the United States of America (Nov. 17, 2006) at 20.[4]  (In the *Jones* case

cited with approval by the U.S. above, plaintiffs alleged systematic torture by officials of Saudi

Arabia; they were determined to be immune from suit. *See also* Statement of Interest at 29.)

---

[4]      Since the immunity is "functional immunity," it makes no difference whether the official
is a high-ranking official or a low-ranking official; the question is whether the official, whatever
his or her rank, has been acting in an official capacity. Thus, the denigration of Director Shi's

The United States went on to note:

> Indeed, parting with this international consensus would threaten serious harm to U.S.
> interests, by inviting reciprocation in foreign jurisdictions. Given the global leadership
> responsibilities of the United States, its officials are at special risk of being made the
> targets of politically driven lawsuit abroad – including damages suits arising from
> alleged war crimes. The immunity defense is a vital means of deflecting these suits and
> averting the nuisance and diplomatic tensions that would ensue were they to proceed. It
> is therefore of critical importance that American courts recognize the same immunity
> defense for foreign officials, as any refusal to do so could easily lead foreign
> jurisdictions to refuse such protection for American officials in turn.

*Id.* at 22.

Moreover, the Executive Branch has made clear that an official does not cease to act in

an official capacity when his actions undertaken in that capacity turn out to be unlawful. Indeed,

the foreign official will still be entitled to immunity even when the actions taken amount to *jus*

*cogens*:

> Here, assuming *arguendo* that the specific conduct plaintiffs allege constituted violation
> of a norm that the United States would recognize as a *jus cogens* violation, the violation
> would remain attributable to the state itself rather than to Dichter personally – because
> the conduct at issue was not private in nature but rather was officially authorized by the
> state. *See Herbage [v. Meese]*, 747 F. Supp. [60 (D.D.C. 1990) at 67 (holding that
> individuals acting in their official capacities as agents of a foreign government are
> entitled to immunity "no matter how heinous the alleged illegalities"). As the Supreme
> Court held in finding that alleged police torture was "sovereign" rather than commercial
> activity, and thus protected by sovereign immunity:
>
>> [H]owever monstrous such abuse undoubtedly may be, a foreign state's exercise
>> of the power of its police has long been understood for purposes of the restrictive
>> theory as peculiarly sovereign in nature. Exercise of the power of police and
>> penal officers is not the sort of action by which private parties can engage in
>> commerce. Such acts as legislation, or the expulsion of an alien, or a denial of
>> justice, cannot be performed by an individual acting in his own name. They can
>> be performed only by the state acting as such.
>
> *Saudi Arabia v. Nelson*, 507 U.S. 349, 361-62 ()1993).

Statement of Interest of the United States of America (Nov. 17, 2006) in *Matar* at 27-28.

---

position as "comparable to the director of a state boot camp system," Response at 12, is simply
irrelevant.

Thus, the U.S. Executive Branch position on common-law foreign-official immunity is clear. So is international law. The 2001 Draft Articles on the Responsibility of States for Internationally Wrongful Acts, promulgated by the International Law Commission, treats any person who performs state functions is treated as a "state organ." The commentary to the Articles states that "[a] particular problem is to determine whether a person who is a state organ acts in that capacity. It is irrelevant for this purpose that the person concerned may have had ulterior or improper motives or may be abusing public power. Where such a person acts in an apparently official capacity, or under colour of authority, the actions in question will be attributable to the state." Article 7 provides that "[t]he conduct of an organ of a state or of a person or entity empowered to exercise elements of the governmental authority shall be considered an act of the state under international law if the organ, person or entity acts in that capacity, even if it exceeds its authority or contravenes instructions."[5]

---

[5]     In the U.S. civil rights case context, it may make a difference whether damages are sought from the U.S. official personally or not (which serves to explain why, in such suits, it is important to determine the capacity in which the official is sued, not the capacity in which he acted). *See* Response at 16-17, 14. Plaintiffs propose a similar criterion for determining immunity in the case of suits against foreign officials, *see id.* at 17 ("Here, Plaintiffs sue the Defendant for money damages out of Defendant's own pocket"), but there is no such criterion in suits against foreign officials. Indeed, if that were the touchstone for determining immunity, the result in *Matar v. Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009), would have been different, since the plaintiffs were seeking damages from the individual defendant, not from the state of Israel. The proper criterion is whether the official is being sued on account of his official-capacity acts or not.

Moreover, the type of relief sought is irrelevant (unlike in suits against U.S. state officials). For example, declaratory relief without damages would also involve ruling on foreign state action, and can be as much an affront to sovereignty as the award of damages. As the Legal Adviser of the Department of State noted in the *Liu Qi* case, "[a]ny determination by this Court in the form of declaratory relief – even if some might regard it to be consistent with the views expressed by the Executive Branch – would have negative implications for the conduct of United States foreign policy. The Chinese Government has vigorously protested these suits at the highest levels, has declined on at least one occasion to send officials to the United States due to fear that they will be harassed and has threatened not to send officials in the future. This negative reaction is based on China's view that suits such as *Liu* and *Xia* represent an illegitimate

8

## II.   THE LAWSUIT IS BASED UPON ALLEGED ACTIONS UNDERTAKEN BY DIRECTOR SHI ACTING IN HIS OFFICIAL CAPACITY.

Thus, the only conceivable circumstance in which Shi Honghui would not enjoy

immunity would be if he had not acted in his "official capacity." It is clear, however, that

plaintiffs are alleging (in highly conclusory, generalized language) that the wrongs committed by

Shi Honghui were committed by him **in his position as an official**. The plaintiffs are very clear

and emphatic about this:

> Defendant, **as the Secretary of the CCP Committee and Director of the Bureau of Reeducation through Labor [RTL] of Guangdong Province**, directs the activities of lower-level employees in the RTL system in Guangdong Province to accomplish the control, suppression and eradication of Falun Gong in Guangdong Province. In this capacity, he collaborates and acts in concert with CCP committees and the Falun Gong Control Office to instigate police officers, facility guards, other detainees, and in all capacities, to inhumanely torture, intimidate and punish Falun Gong practitioners.

> Defendant, **as the Secretary of the CCP Committee and Director of the Bureau of Reeducation through Labor of Guangdong Province**, gives security of the RTL system, other extrajudicial security and even other detainees increased authority to carry out a heightened campaign of arbitrary detention, torture, sexual assault, and even murder against Falun Gong practitioners. . . . . .

> Defendant **uses his position** illegitimately to set policy guidelines, design and implement programs, and supervise the carrying out of the campaign of persecution against Falun Gong, including supervisory authority over the treatment of all Falun Gong practitioners at the RTL system in Guangdong Province. He was directly and ultimately responsible for the abuses of arbitrary detention, torture and execution as a result of torture, that took place under the supervision of the RTL system in Guangdong Province. He improperly and illegally **exercised the authority under his mandate** to appoint, discipline and remove those in position who did not comply with the directives of his office. The way the Defendant **exercised his authority** placed him in the position of violating the Constitution and national law of the People's Republic of China in pursuit of a campaign of repression against Falun Gong.

> The following specific abuses, constituting torts involving the most serious forms of intentionally inflicted physical and mental suffering and injury, were inflicted upon the plaintiffs as a direct result of the actions of the Defendant and those with whom he acted in concert to carry out **the officially sanctioned and mandated policy** of persecuting,

---

assertion of U.S. legal competence over matters that are internal Chinese affairs." Letter from Legal Adviser of the Department of State to Assistant Attorney General (Aug. 3, 2004) at 2, *attached to* Statement of Interest of the United States in *Doe v. Liu Qi* (docket #94).

punishing and intimidating Falun Gong practitioners . . . . They were carried out by Defendant and the other CCP officials with whom he conspired, **acting in their official capacity and under color of law**, with the specific intent and purpose of abridging and denying the Plaintiffs of their internationally protected human rights . . . .

Complaint ¶¶ 56-58, 65 (emphasis added).

Thus, these alleged wrongs are not things Director Shi is alleged to have done "on his own time," as a private citizen, and with only the powers of a private citizen. It is specifically alleged that he committed wrongs in his official position. Moreover, the PRC has made clear, in a communication attached to an Order to Show Cause in this case, that Director Shi was acting in his official position at the relevant times and that China considers him to be entitled to immunity:

> Mr. Shi is an official of the Government of the People's Republic of China. He is performing his official duty entrusted to him by law in managing the system of education through labor in Guangdong Province. His relevant actions are official duties and fall into the category of state actions. Mr. Shi therefore should enjoy sovereign immunity and shall not be subject to jurisdiction of any US court.

Communication CE155/09 of the Embassy of the PRC, attached to December 17, 2009 Order to Show Cause. *Compare Estate of Ferdinand E. Marcos, Human Rights Litig.* ("*Hilao II*"), 25 F.3d 1467, 1472 (9th Cir. 1994) (Philippine government confirmed that Marcos' actions were "in violation of existing law"); *Estate of Ferdinand E. Marcos Human Rights Litig. ("Trajano v. Marcos*"), 978 F.2d 493, 498 (9th Cir. 1992) (daughter of President Marcos admitted acting on her own authority, not on the authority of the Republic of the Philippines; hence jurisdiction existed over her in her individual capacity); *Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997) (defendant National Defense Security Council disavowed officials' acts as beyond their authority); *with Matar v. Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009) (defendant confirmed by state of Israel to have been acting in official capacity).[6]

---

[6]     "Courts assign 'great weight' to the opinion of a sovereign state regarding whether one of its officials was acting within his official scope." *Matar*, 500 F. Supp. 2d at 284.  In the

Plaintiffs argue that the conduct at issue here differs from the conduct of individual officials acting in their official capacities that the Second Circuit found to be covered by common-law immunity in *In re Terrorist Attacks*, 538 F.3d 71 (2d Cir. 2008). They argue that the alleged conduct here is materially different, in the nature of *jus cogens* violations, and therefore falls outside any possible common-law immunity. *See* Response at 4. But, as already noted above, the Executive Branch has made clear (in its Statement of Interest in *Matar*, for example) that immunity covers official acts even when such acts amount to *jus cogens*. In those circumstances "the violation would remain attributable to the state itself rather than to [the individual official] personally." *Matar* Statement of Interest at 27.[7]

Plaintiffs also argue that Director Shi acted outside his authority because, they allege, he acted contrary to Chinese law. *See* Response at 6-7, 15-16. Once again, in *Matar v Dichter*, the Executive Branch addressed a similar claim and made clear that acts contrary to domestic law are still official-capacity acts when ratified by the foreign state in question, and specifically rejected the view that actions contravening an official's statutory mandate cannot be official-capacity acts. *See Matar* Statement of Interest at 31-32, 32 n.25. *See also Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995) (act "in violation of a nation's fundamental law" can still be act of state unless "wholly unratified by that nation's government"); *cf. Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) (case against Henry Kissinger dismissed even though alleged covert

---

*Samantar* case itself, no claim of immunity for the official's alleged conduct has been made by any government that the U.S. Government recognizes, hence that case is proceeding.

[7]   Although in the Response plaintiffs refer to "Defendant's acts of torture and persecution of Plaintiffs," *id.* at 6, actually plaintiffs have not identified any particular act of alleged torture or persecution by Director Shi. Instead, the Complaint is a tissue of the same general and conclusory kind about his supervision and management that were made against Attorney General Ashcroft and FBI Director Mueller in *Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S.Ct. 1937 (2009) – a fatal defect in the Complaint and an independent ground for dismissal, to which we shall return in a subsequent section of this analysis.

program he was carrying out was contradictory to official U.S. policy). In this case, China informed the United States in its Communication CE155/09 of the Embassy of the PRC that Director Shi's "relevant actions are official duties and fall into the category of state actions." The communication makes clear that Director Shi has been "exercising sovereignty of behalf of the state," *id.*, affirming that Director's Shi's acts are attributable to the Chinese state. "A sovereign state has the exclusive right to determine what is and is not illegal or unconstitutional under its own domestic law." *Regina v. Bow Street Magistrate (No. 3) Ex parte Pinochet*, [2000] 1 App. Cas. 147, 283 (Eng. 1999) (Lord Millett).

Moreover, plaintiffs' basic argumentative premise that an action by an official contrary to his statutory mandate means that the official must have been acting outside his official capacity is wholly mistaken. It clearly cannot be true that if an official takes an incorrect action, he thereby ceases to be an official, and his actions are not attributable to the state but are his own personally – any more than if a court makes a mistaken decision in a lawsuit, it ceases to be a court.

Indeed, cases deciding whether U.S. officials have acted within the scope of their office or employment have repeatedly confirmed that officials who are alleged to have violated international or domestic law are still considered to be acting in their official capacities. For example, in *Rasul v. Myers,* 512 F.3d 644 (D.C. Cir. 2008), plaintiffs sued the U.S. Secretary of Defense and other U.S. high officials under the Alien Tort Statute, alleging that these U.S. officials were responsible for the torture, cruel, inhumane, and degrading treatment and prolonged arbitrary detention of plaintiffs, who had been detainees at Guantanamo Bay, Cuba. The United States Government intervened to certify under the Westfall Act (28 U.S.C. § 2679(d)(1)) that the defendant U.S. officials were acting within the scope of their office or

12

employment at the time of the incident out of which the claim arose, with the consequence that the United States should be substituted as defendant in an action converted into a case under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. The plaintiffs contended that as a matter of law, the defendants were not acting within the scope of their employment, because torture and similar international law violations can never be official acts legitimately within the scope of a government official's duties, and because such conduct violates the U.S. Constitution, U.S. treaties and other sources of U.S. law. The court ruled that even such "seriously criminal" conduct as the alleged torture and inhumane treatment was a "foreseeable consequence" of the employment of Donald Rumsfeld and the other defendant officials in their respective positions, and therefore fell within the scope of their office or employment. As a result, the court dismissed the international law claims against the U.S. officials (and then proceeded to dismiss the case as to the substituted defendant, the United States, for lack of subject-matter jurisdiction, because the plaintiffs had failed to exhaust their administrative remedies as required by the FTCA).

In *Bancoult v. McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004), plaintiffs brought claims under the Alien Tort Statute against the United States and various current and former officials of the Department of State and the Department of Defense for alleged torture, genocide and other offenses. The plaintiffs argued that "the individual defendants' conduct constituted a violation of '*jus cogens* norms and fundamental human rights' and as such, these acts were not within the scope of their employment." *Id.* at 7. The court found that even alleged torture and genocide fell within the scope of the officials' employment. It therefore dismissed the case against them and then dismissed the case against the substituted defendant, the United States, on the grounds that the case presented nonjusticiable political questions. The appeals court affirmed, specifically

13

finding that under "general common law principles," the alleged actions of the U.S. officials did not fall outside the scope of their employment. *Bancoult v. McNamara,* 445 F.3d 427, 438, 438 n.6 (D.C. Cir. 2006).

Likewise, in *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), the complaint alleged that Henry Kissinger, who at the time of the relevant events was the National Security Advisor to the President of the United States, had caused, through a covert program in contradiction of the U.S. official policy of respecting the sovereignty of other states, the kidnapping, torture, and death of plaintiffs' decedent (the commander-in-chief of the Chilean Army), in furtherance of a coup to prevent Dr. Salvador Allende from coming to power in Chile. The court ruled that it lacked jurisdiction because the case presented nonjusticiable political questions. In addition, as the United States stated when it submitted the opinion in *Schneider* to the court in the *Rasul* case as supplemental authority for its position, "[a]lthough the D.C. Circuit did not directly decide in *Schneider* whether Kissinger's alleged conduct was within the scope of his federal employment for purposes of the Liability Reform Act, the Court effectively resolved that issue by rejecting the tort claims against him on political question grounds. There would have been no separation of powers concerns implicating the political question doctrine in *Schneider* if Kissinger's alleged actions had fundamentally exceeded the scope of his position with the Executive Branch." Defendants' Notice of Supplemental Authority in *Rasul v. Rumsfeld* (July 26, 2005) at 2-3, No.: 1: 04cv01864-RMU (D.D.C. ) (docket #21). *Compare Kissinger with Doe v. Liu Qi*, 349 F. Supp. 2d 1258, 1286-1287 (N.D. Cal. 2004) (making contrary ruling that "acts by an official which violate the official laws of his or her nation but which are authorized by covert unofficial policy of the state" should be deemed outside the official's scope of authority).

14

In *Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008), the plaintiff brought tort claims against officials of the Central Intelligence Agency (CIA) and other U.S. officials, alleging that they caused and conspired to cause the imprisonment, torture and summary execution of her husband, a guerilla rebel leader in Guatemala. The court found that despite the nature of the conduct alleged against the U.S. officials, they had been acting within the scope of their office or employment, and affirmed the dismissal of the case by the court below as to the substituted defendant, the United States, on grounds of its immunity. *See Harbury*, 522 F.3d at 397 ("'the tortious conduct was triggered or motivated or occasioned by the conduct then and there of the employer's business even though it was seriously criminal.'") (*quoting Rasul*, 512 F.3d at 660).

Consequently, it cannot seriously be maintained that because an official's action is contrary to the law of his state or is contrary to international law, that action cannot be an official act, or that that action cannot be attributable to the state. These cases say the opposite. These cases say that cases against U.S. officials alleging wrongs similar to those alleged in U.S. courts against Chinese officials should be dismissed. Obviously, it would be the height of hypocrisy for a U.S. court to decline to exercise jurisdiction over its own officials while purporting to have a right to exercise jurisdiction over Chinese officials with regard to their actions within China.

In support of their argument to the contrary, plaintiffs cite a Northern California district court default judgment against two Chinese officials, Liu Qi and Xia Deren, *Doe v. Liu Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004). This case was wrongly decided by a magistrate judge (in an opinion subsequently adopted as the opinion of the court) by, among other things, interpreting "scope of authority" far more narrowly than the same concept was interpreted in the *Rasul*,

(

*Bancoult, Kissinger* and *Harbury* cases.[8] The case (which is also pre-*Twombly* and pre-*Iqbal*) was based on a complaint that contained non-specific and conclusory allegations concerning the management and supervisory activity of the defendant officials similar to those in this case, and contained a similar attack on the Chinese state's overall actions vis-à-vis the Falun Gong. Giving credence to the conclusory allegations against the officials, the magistrate decided that the officials had acted outside the scope of their authority. However, he also ruled that the acts he found to be wrongful had been ratified by the Chinese state, and therefore constituted acts of state. 349 F. Supp. 2d at 1295. This, according to the Executive Branch's Statement of Interest in *Matar*, would mean that the acts in question were official acts, and that the officials were therefore entitled to immunity. Nevertheless, the magistrate contradictorily considered that the officials were not immune. The *Liu Qi* case is not a good precedent, because it was decided under pre-*Samantar* principles, and it was wrongly decided under those principles, especially with respect to whether the alleged acts for which the officials were attacked were undertaken in their official capacities or not; because it misapplied the act of state doctrine (which is addressed further below); and because the allegations of the underlying complaints would now fail to meet the *Twombly* and *Iqbal* standards.

The short of it is that the allegations in the Complaint are allegations that Director Shi is liable for wrongs he committed while acting in his official capacity. For such acts the common law affords immunity to foreign officials.

---

[8]     Because *Liu Qi* is a pre-*Samantar* case, the magistrate purported to follow the Ninth Circuit's ruling in *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103, 1106-07 (9th Cir. 1990), that an official could be an FSIA "agency or instrumentality" if he were acting within his "scope of authority" -- in other words, the same concept as was applied in the *Rasul, Bancoult, Schneider* and *Harbury* cases. The concept should be applied uniformly, especially since the scope of authority language found in the FSIA (and in the Westfall Act) was borrowed from the Federal Tort Claims Act. (Other parts of the FSIA were also directly borrowed from the FTCA. *Compare, e.g.*, 28 U.S.C. § 1605(a)(5)(A) and (B), *with* 28 U.S.C. §§ 2680(a) and (h).)

16

Moreover, it is clear that the Complaint, like the complaints filed in other cases, constitutes an attack on Chinese state law and policy on the Falun Gong. This is an attempt by plaintiffs to have a U.S. court pass on the legality of Chinese state action within China's own territory. To adjudicate such a case would be to adjudicate against the Chinese state itself for acts undertaken within its own territory.

The plaintiffs trace out one other argument that is supposed, somehow, to make Director Shi's acts non-official acts. They argue that is that "CCP [Chinese Communist Party] members are not government officials" and therefore are not entitled to immunity. Response at 2-4. They emphasize that "the CCP is distinct from the Chinese government." Id. at 2. Here the plaintiffs make the fundamental mistake of equating "the government" with "the state," as if every state were organized exactly like the United States.[9] But that is not a topic that needs to be explored here, for the simple reason that the plaintiffs have alleged that Director Shi was a government official at all the times he is alleged to have committed wrongs in the exercise of his office. Moreover, from the plaintiffs' stated perspective, the fact that Director Shi was also a Communist Party official at the same time is just as irrelevant as the fact that the Attorney General of the United States in the *Iqbal* case was also a member of the Republican Party at the same time, in a case claiming the Attorney General had a policy of condoning torture in U.S. detention facilities.

The plaintiffs also claim that "common law immunity cannot function as a bar to the TVPA. Response at 9. The claim is incorrect. The TVPA was not intended to override any

---

[9]     For example, as the United States noted in the *Bo Xilai* case, "Bo [Xilai] has been named to **the Politburo of the Communist Party of China**, a significant position within **the PRC's constitutional structure**." Response of the United States to Plaintiffs' Supplemental Submission (June 30, 2008) at 2 n.1 (emphasis added), in *Bo Xilai*, 1:04-cv-00649-RJL (D.D.C.) (docket #26).

17

existing immunities. In fact, the legislative history of the TVPA recognizes that current officials will be immune, and also recognizes that former officials may also be immune. *See* S. Rep. No. 249, 102d Cong. 1st Sess. (1991), *Who Can Be Sued*.[10] See also Statement of Interest in *Matar* at 34.

### III.    THE CASE IS BARRED BY THE ACT OF STATE DOCTRINE.

Under the U.S. act of state doctrine, "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The act of state doctrine "requires reviewing courts to 'deem valid' the acts of foreign sovereigns taken within their own jurisdictions. In every case in which the Supreme Court has held the act of state doctrine applicable, 'the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory'" (emphasis added). *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, ___(1990). That is what the plaintiffs are seeking to have the Court do here – declare that acts of Director Shi (although no specific acts are identified) undertaken in China in his official capacity are invalid.

Moreover, as in the *Liu Qi* case, in reality "this suit is directed at PRC government policies rather than past conduct of a specific official." *See* Letter of Legal Adviser of the Department of State to Assistant Attorney General (Sept. 25, 2002) at 4 n.3 in *Doe v. Liu Qi* (docket #94). The goal of the plaintiffs is to obtain a U.S. court judgment declaring invalid laws and policies of the Chinese state with respect to matters within China's own territory.

---

[10]    At the time the TVPA was enacted, it was understood that foreign officials would enjoy immunity under the FSIA, so the TVPA legislative history speaks in terms of FSIA immunity rather than common-law immunity. The basic point remains, that the TVPA did not override the existing immunities, whatever their source. The act of state doctrine also applies to TVPA claims brought against current officials such as Director Shi. *See* S. Rep. 249, *Who Can Be Sued*.

Consequently, the act of state doctrine unambiguously applies here. Plaintiffs alternate back and forth between alleging that Director Shi was acting in his official capacity and that his actions were officially sanctioned, and alleging that they were not. China has, however, informed that the Court that Director Shi has been acting in his official capacity. That is certainly China's right to do. "A sovereign state has the exclusive right to determine what is and is not illegal or unconstitutional under its own domestic law." *Regina v. Bow Street Magistrate (No. 3) Ex parte Pinochet*, [2000] 1 App. Cas. 147, 283 (Eng. 1999) (Lord Millett). This U.S. act of state doctrine confirms that a foreign court cannot and should not declare invalid a declaration of the Chinese state concerning the legality of the actions taken on China's own territory of one its own officials. To attempt to do otherwise would smack of the "extraterritoriality" that the foreign powers' courts exercised on Chinese soil when they shamefully exercised jurisdiction on Chinese territory during the Qing Dynasty.

## IV.    THE COURT IN ANY EVENT SHOULD DECLINE JURISDICTION OVER THE CASE IN THE INTEREST OF INTERNATIONAL COMITY.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113 (1895). In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court recognized that the potential for adverse foreign policy effects will be especially great where U.S. courts are asked to sit in judgment of the conduct of foreign officials abroad. "It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." *Sosa*,

19

542 U.S. at727. In such circumstances, even if jurisdiction were to exist, and even if immunity were in question, the Court should exercise "case-specific deference." *See id.* at 733 n.21. Indeed, how could the Court do otherwise, when, as the cases against U.S. officials cited above demonstrate, the cases making similar allegations against U.S. officials have always been dismissed? It would be the height of hypocrisy, and an insult to Chinese sovereignty, to assert that U.S. courts can adjudicate such claims against Chinese officials but not U.S. officials.

In the *Bo Xilai* case, the United States described the problematic nature of a lawsuit such as this one. It stated that "the FSIA, like the act of state doctrine, would require a difficult and diplomatically undesirable inquiry into whether Minister Bo was 'acting in his official capacity on behalf of a foreign state.' Although the gravamen of the complaint is a challenge to the official policy of the Chinese government in banning the Falun Gong, the Court might need to inquire into such sensitive subjects as whether the Chinese government authorized or ratified the specific alleged acts of Minister Bo, which include responsibility for alleged torture and extrajudicial killing . . . ." Suggestion of Immunity and Statement of Interest of the United States in *Bo Xilai*, July 24, 2006, at 18 (docket entry #16-1). Here, the United States speaks of an undesirable inquiry in terms of the FSIA and the act of state doctrine, because the court at the time considered the FSIA to apply; but the problem with adjudication is the same in a regime of common-law immunity, given that the inquiry still is into the question of "acting in official capacity on behalf of a foreign state." For that reason, the same considerations that counseled against adjudication in the *Bo Xilai* case likewise counsel against it in this case.

Likewise, in *Doe v. Liu Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004), the Legal Adviser of the Department of State advised that "[p]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would

20

in our view argue in favor of finding the suits non-justiciable." 349 F. Supp. 2d at 1271, 1297.
The State Department counseled that "U.S. courts should be cautious when asked to sit in
judgment on the acts of foreign officials taken within their own countries pursuant to their
government's policy. This is especially true when (as in the instant cases) the defendants
continue to occupy governmental positions, none of the operative acts are alleged to have taken
place in the United States, personal jurisdiction over the defendants has been obtained only by
alleged service of process during an official visit, and the substantive jurisdiction of the court is
asserted to rest on generalized allegations of violations of norms of customary international law
by virtue of the defendants' governmental positions." Letter of Legal Adviser of the Department
of State to Assistant Attorney General (Sept. 25, 2002) at 7-8, in *Liu Qi* (docket #94). All of
these considerations apply in this case. Director Shi continues to occupy a governmental
position. None of the operative acts are alleged to have occurred in the United States. Director
Shi came to the United States in his capacity as the Director General of the Drug Rehabilitation
Research Committee of the China Society for Reeducation Through Labor, and was visiting a
licensed outpatient addiction treatment center in New York. The allegations against him consist
of the same sort of generalized allegations of violations of norms of customary international law
by virtue of his governmental position that were made against Liu Qi and Xia Deren (but since
that time, the Supreme Court has tightened the rules concerning the sufficiency of such
conclusory allegations, as discussed further below). These factors militate, as the State
Department indicated previously, in favor of declining to adjudicate the case.[11]

---

[11]      Moreover, this is true regardless of what kind of relief might be awarded. After *Sosa* was
decided, the Legal Adviser advised the Acting Assistant Attorney General in a letter provided to
the court in *Liu Qi* that "we disagree with the view that declaratory relief of the nature sought
would neutralize any foreign policy concerns about adjudication of these cases." Letter of Legal

21

## V.    THE CLAIMS ALLEGED DO NOT FALL WITHIN THE CLASS OR OFFENSES RECOGNIZED BY THE ALIEN TORT STATUTE OR THE TORTURE VICTIM PROTECTION ACT.

This case, like the *Bo Xilai* case, is founded on allegations of "civilian command responsibility." Director Shi is alleged not to have directly committed any of the individual wrongs asserted by plaintiffs, but to have been "directly and ultimately responsible" for the alleged wrongs by virtue of his position. *See* Complaint ¶ 58. Whether or not such a claim can even be pleaded against an official under the Alien Tort Statute depends on whether the claim meets the requirements of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). In *Sosa*, the Supreme Court limited the causes of action recognized under the Alien Tort Statute to those claims resting on "a norm of international character accepted by the civilized world" and "defined with a specificity comparable to the features of the 18th century paradigms." The allegations against Director Shi do not meet such requirements.

The doctrine of command responsibility "appears to be well accepted in U.S. and international law in connection with acts committed in wartime." *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767, 777 (9th Cir. 1996). However, although civilian command responsibility has been recognized by some tribunals, its elements are in flux, which means that it cannot meet the second *Sosa* standard as a claim that can be brought under the Alien Tort Statute; it lacks the specificity comparable to the 18th century paradigms. Both international legal statutes and rulings have established varying standards for the particular elements necessary to constitute civilian command responsibility, in particular with regard to the superior-subordinate element and the *mens rea* standard.

---

Adviser of the Department of State to Assistant Attorney General (Aug. 3, 2004) in *Liu Qi* at 2. The magistrate unfortunately failed to heed the counsel of the State Department in *Liu Qi*.

The magistrate in the *Liu Qi* case noted the lack of specificity regarding the superior-subordinate element of command responsibility, stating that "international law does not appear to be well established" regarding the concept of effective control within a situation of collective authority. *Liu Qi*, 349 F. Supp. 2d at 1331- 1332. From this, of course, the magistrate should have concluded that civilian command responsibility is not defined with a specificity comparable to 18th century paradigms, and therefore is not a claim that can be brought under the Alien Tort Statute. This is another mistaken facet of the legal reasoning underpinning the *Liu Qi* decision.

The variation in interpretations of the superior-subordinate element by the International Criminal Tribunal for the former Yugoslavia (ICTY) and International Criminal Tribunal for Rwanda (ICTR) demonstrates the lack of specificity surrounding civilian command responsibility. The Trial Chamber in *Prosecutor v. Delalic*, (Trial Chamber ICTY, Nov. 16, 1998), ruled that control can be of a *de facto* or *de jure* character and that it "shares the view expressed by the International Law Commission that the doctrine of superior responsibility extends to civilian superiors only to the extent that they exercise a degree of control over their subordinates which is similar to that of military commanders." *Id.* at ¶ 378. But in *Prosecutor v. Aleksovski*, (Trial Chamber ICTY, June 25, 1999) IT-95-14/1-T, the court expressed a different view: "To require a civilian authority to have sanctioning powers similar to those of a member of the military would so limit the scope of the doctrine of superior authority that it would hardly be applicable to civilian authorities." *Id.* at ¶ 78.

The ICTR has also varied in its interpretation of the superior-subordinate element and whether military-like control is necessitated under the command responsibility doctrine. In *Prosecutor v. Bagilishema,* (Trial Chamber ICTR, June 7, 2001), ICTR-95-1, ¶¶ 42 – 43, "the Chamber agrees with the approach articulated by the International Law Commission . . . namely

23

that the doctrine of command responsibility 'extends to civilian superiors only to the extent that they exercise a degree of control over their subordinates which is similar to that of military commanders.'" But in *Prosecutor v. Ntakirutimana*, (Trial Chamber ICTR, Feb. 21, 2003), 1:ICTR-96-10, 2:ICTR-96-17, ¶ 819, the Chamber directly **contradicted** *Bagilishema*, ruling that "civilian leaders may incur criminal responsibility for acts committed by their subordinates or others under their 'effective control', although the control exercised need not be of the same nature as that exercised by a military commander."

Both the variation in statutory language between the ICC and ICTY/ICTR and the lack of standardization in the jurisprudence surrounding the superior-subordinate element of command responsibility demonstrate that this doctrine fails to be defined with the level of specificity comparable to features of 18th century paradigms.

The requisite specificity is missing also in the case of the *mens rea* requirement for civilian command responsibility. While the ICTY and ICTR statutes establish a *mens rea* standard under which a defendant either must have known, or **should have known**, that individuals under his command were committing crimes, the Rome Statute of the International Criminal Court (ICC) (July 17, 1998) sets a completely new statutory norm. Under the Rome Statute, it must be demonstrated that "[t]he superior either knew, **or consciously disregarded information** which clearly indicated, that the subordinates were committing or about to commit such crimes." Rome Statute art. 28(b)(i) (emphasis added). This different knowledge standard established by the ICC applies only to civilians and is "sufficiently distinct from the language of the previous standards and from the ICC military standard so that it is unlikely that a court will construe them to be equivalent." Greg R. Vetter, *Command Responsibility of Non-Military Superiors in the International Criminal Court (ICC)*, 25 Yale J. Int'l L. 89, 123 (2000).

24

The magistrate in the *Liu Qi* case took note of these variations between the ICTY, ICTR and ICC governing statutes, stating that "[t]o be sure, at least one source of international law – the Rome Statute of the International Criminal Court (as amended on Nov. 10, 1998 and July 12, 1999) – draws a distinction between the imposition of criminal liability" upon military commanders and civilian leaders. *Liu Qui*, 349 F. Supp. 2d at 1333. However, once again, the magistrate, instead of acknowledging the lack of the requisite specificity, opined that despite this difference in standards in a criminal context, "logic suggests that the imposition of civil liability may proceed on a **broader** theory of responsibility." *Id.* (emphasis added). In other words, he chose to ignore the lack of specificity by attempting to generalize so that the variance in standards would seem to disappear. This is not a way to satisfy *Sosa*'s specificity requirement. It is hardly the "vigilant doorkeeping" that the Supreme Court in *Sosa* instructed the lower courts to exercise with regard to Alien Tort Statute claims. *See Sosa*, 542 U.S. at 729.

By similar reasoning, the differences in the *mens rea* requirement for aiding and abetting claims have been viewed as not creating a bar to bring such claims under the Alien Tort Statute in *In re South African Apartheid Litigation (Ntsebeza v. Daimler AG)*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009). There it was claimed a "lowest-common-denominator approach" was employed, with the differences between the elements of aiding and abetting in the Rome Statute of the International Criminal Court from other sources of law – the Rome Statute includes a purpose requirement – being treated as if they were not real differences. *See id.* at 260. It was claimed that this approach would "prevent[ ] the imposition of liability in American courts that might not be ordered in an alternative forum," *see id.*, but that addresses a different concern – it does nothing to satisfy the *Sosa* test whether the putative cause of action is "defined with a specificity comparable to the features of the 18th century paradigms." And, in fact, the approach

25

in *Ntsebeza* is not really a lowest-common-denominator approach. A lowest-common-denominator approach would *include* the Rome Statute purpose requirement; a claim setting out that element would satisfy the criteria of all sources of international law, with none being disregarded. That would also accord with the finding of Judge Katzmann and Judge Korman in *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 277, 332-33 (2d Cir. N.Y., 2007), that an aider and abetter must have the intent or purpose that the wrong will occur.

Given that the entire complaint against Director Shi is based on a theory of civilian command responsibility that cannot meet *Sosa*'s specificity standard, plaintiffs' claim under the Alien Tort Statute must be dismissed for that reason. Moreover, command responsibility under the Torture Victim Protection Act requires that the defendant have "authorized, tolerated or knowingly ignored" the wrongs alleged. *See* S. Rep. 249, *Who Can Be Sued.* Nothing in the Complaint alleges Director Shi's knowing or knowingly ignoring the wrongs the plaintiffs allege they suffered, as discussed further below.

## VI. THE COMPLAINT MUST BE DISMISSED IN ANY EVENT UNDER THE STANDARDS OF *TWOMBLY* AND *IQBAL*

A difficulty in addressing in any detail plaintiffs' claims that Director Shi acted beyond his official capacity is that plaintiffs have provided no detail – they actually have made no allegations of particular actions in which he was engaged, and have given no dates, times, or places where he allegedly engaged in any particular actions. The case is remarkably like the *Iqbal* case, and must be dismissed for the same reasons. Indeed, because of the foreign relations implications and the fact that foreign sovereign immunity is not simply immunity from suit but from all the entanglements of the judicial process, the grounds for dismissing this case are even stronger than in *Iqbal*.

26

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), specifies the pleadings standards that complaints must meet. These were further clarified in *Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S.Ct. 1937 (2009). In that case the plaintiff Iqbal, a Pakistani Muslim, sued John Ashcroft, the former U.S. Attorney General, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI), alleging that he had been subjected by them to violations of U.S. constitutional rights during his detention on criminal charges in the wake of the September 11, 2001 terrorist attacks. Iqbal's claim was that Mueller and Ashcroft knew of, condoned, and willfully and maliciously agreed to subject Iqbal to harsh conditions of confinement as a matter of policy, solely on account of the prohibited factors and for no legitimate penological interest; and that Ashcroft was the policy's "principal architect," and Mueller was "instrumental" in its adoption and execution. The Supreme Court ordered that the case against Ashcroft and Mueller be dismissed. A complaint cannot simply contain "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements"; these do not suffice to meet the requirement in the civil procedure rules of "a short and plain statement of the claim." 129 S.Ct. at 1949. A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" and a lower court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. at 1949, 1950.

Here, highly conclusory allegations are made against Director Shi, that, for instance, he "uses his position illegitimately," Complaint ¶ 58 – a conclusion masquerading as a fact, without any concrete information concerning any particular act of Director Shi that would support such a conclusion. There are no particularized factual allegations that Director Shi authorized, tolerated or knowingly ignored the wrongs the plaintiffs allege they suffered. Instead, the complaint

27

makes only generalized allegations of responsibility. Such conclusory allegations do not suffice

to sustain a complaint under the pleadings rules enunciated in *Twombly* and *Iqbal*.[12]

Where the immunity of a foreign official is involved for acts attributable to the foreign

state, it is essential that the immunity be a genuine immunity from suit. Such immunity

"involves protection from suit, not merely a defense to liability." *Foremost-McKesson, Inc. v.*

*Islamic Republic of Iran*, 905 F.2d 438; 449 (D.C. Cir. 1990); *Phoenix Consulting, Inc. v.*

*Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000). It is an "'entitlement not to stand trial or

face the other burdens of litigation.'" *Iqbal*, 556 U.S at . ___, *quoting Mitchell v. Forsyth*, 472

U.S. 511, 526 (1985). A plaintiff should not be allowed to make an "end run" around such

immunity from legal proceedings by means of conclusory allegations. *Twombly* and *Iqbal*

already stand as gatekeepers against such end runs, but due to the special concerns surrounding

foreign sovereign immunity, not to mention the potential deleterious effects on bilateral relations,

the rules of *Twombly* and *Iqbal* must be applied with even more scrutiny than in the ordinary

civil lawsuit.[13] The Complaint here only sets out a series of conclusory allegations against one

---

[12]    These principles also apply in default judgment situations. *See Wynne v. Birach*, 2009
U.S. Dist. LEXIS 102276 (E.D. Va. Nov. 3, 2009) ("this standard [the standard for deciding
whether to render a default judgment] is similar to that applied to a motion to dismiss under Rule
12(b)(6), Fed. R. Civ. P, as both require a trier of fact to take the well-pleaded allegations against
the defendant as true. *Compare Iqbal* . . . "); *Bogopa Serv. Corp. v. Shulga*, 2009 U.S. Dist.
LEXIS 48469 (W.D.N.C. June 10, 2009) and *De Lotta v. Dezenzo's Italian Rest., Inc.*, 2009 U.S.
Dist. LEXIS 110257 (M.D. Fl. Nov. 24, 2009).
[13]    The Department of State has long been aware of the potential posed by the ease of filing
conclusory allegations against foreign officials. As it testified before the Senate Committee on
the Judiciary during the consideration of the TVPA, "From a foreign policy perspective, we are
particularly concerned over the prospect of nuisance or harassment suits brought by political
opponents or for publicity purposes, where allegations may be made against foreign governments
or officials who are not torturers but who will be required to defend against expensive and
drawn-out legal proceedings. Even the foreign government declines to defend and a default
judgment results, such suits have the potential of creating significant problems for the
Executive's management of foreign affairs. We believe that inquiry a U.S. court into the
legitimacy of foreign government sanctions is likely to be viewed as highly intrusive and

Chinese government official who had the misfortune to visit New York and to be accosted by process servers there. The Complaint should be dismissed for the insufficiency of its pleadings.

## CONCLUSION

Accordingly, for the above several reasons, the Complaint in this case must be dismissed.

Chinese Society of Private International Law

---

offensive." S. Hrg. 1-1-1284 on S. 1629 and H.R. 1662 (June 22, 1990) at 28 (Prepared Statement of David P. Stewart).