UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────

No. 09 Civ. 8920 (RJS)

───────────────────

HUA CHEN, *et al.*,

Plaintiffs,

VERSUS

HONGHUI SHI,

Defendant.

───────────────────

MEMORANDUM AND ORDER
August 1, 2013

───────────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Hua Chen ("Chen") and Yu Yun Zou ("Zou," and with Chen, "Plaintiffs"), members of the Falun Gong movement who currently reside in the United States as refugees from the People's Republic of China ("China"), bring this putative class action against Defendant Honghui Shi ("Defendant"), a Chinese government official and senior member of the Chinese Communist Party ("CCP"), alleging violations of the Alien Tort Statute and Torture Victim Protection Act. Plaintiffs purport to represent all of their co-religionists who, like them, allegedly suffered grave persecution by the Chinese government. Because Defendant has failed to appear to defend this action, Plaintiffs have moved for a default judgment. In light of Plaintiffs' motion, the Court now considers whether it has authority to enter judgment against Defendant and, finding that it does not, dismisses this case.

I. BACKGROUND

A. Facts

Plaintiffs are practitioners of Falun Gong, a spiritual discipline consisting mainly of exercises and meditation designed to foster health, fitness, and "self-cultivation."[1] (Compl. ¶¶ 38–39.) Introduced in 1992, Falun Gong now claims over 100 million adherents, most of whom

───────────────────

[1] All facts are drawn from the Complaint ("Compl.").

are in China. (*Id.* ¶ 40.) Although Chinese authorities initially supported the practice of Falun Gong, since 1996 they have restricted the spread of its teachings and persecuted its members. (*Id.* ¶¶ 41–42.) In 1999, following a gathering of more than 10,000 Falun Gong practitioners to protest their persecution, the Chinese government intensified its campaign against the movement at the direction of the ruling CCP. (*Id.* ¶¶ 43–44, 47, 59–61.) It began to arrest the movement's practitioners and to subject them to forced labor, imprisonment, and brainwashing. (*Id.* ¶¶ 47–52.)

Both Plaintiffs allege that they suffered years of brutal persecution by Chinese authorities due to their outspoken adherence to Falun Gong. Chen alleges that she was first detained in July 1999 while on her way to Beijing to advocate the benefits of Falun Gong to the Chinese government. (*Id.* ¶ 9.) Although her detention following that initial arrest was brief, the arrest caused her to be demoted from a senior executive position to a floor post in one of her employer's factories. (*Id.* ¶ 9.) Chen was detained again in April and June of 2000, each time for a period of fifteen days. (*Id.* ¶ 12.)

In July 2000, Chen began a two-year term of detention designed to force her to renounce her Falun Gong membership. (*Id.* ¶ 13.) During that time, she was imprisoned in various detention centers in China, where she was beaten, tortured, and forcibly fed. (*Id.* ¶ 14.) In August 2000, Chen was transferred to a forced labor camp, where on top of being forced to work sixteen hours a day, she was subjected to sleep deprivation, beatings, and psychological torture. (*Id.* ¶ 16.) The psychological torture included having to continuously watch videos or listen to articles and books that defamed Falun Gong for up to seventeen hours at a time. (*Id.*)

In July 2002, Chen's term of forced labor was extended for another 529 days. (*Id.* ¶ 17.) That period, however, was cut short in October 2002 when, after four days of intense torture, interrogation, and brainwashing, Chen signed papers renouncing her adherence to Falun Gong. (*Id.* ¶¶ 18–19.) But Chen did not in fact abandon Falun Gong. She continued its practice and, as a result, was detained anew in April 2004 for a period of roughly two months. (*Id.* ¶ 20.) Chen ultimately fled to Thailand and obtained refugee status, and from there moved to the United States. (*Id.* ¶ 23.) All of the abuse Chen alleges took place in China, much of it in Guangdong province. (*See id.* ¶¶ 9–10, 14–15, 20.)

Zou started practicing Falun Gong in 1998, and, like Chen, her odyssey of detention, abuse, and torture began in July 1999 when she advocated for Falun Gong to Chinese authorities in Beijing. (*Id.* ¶¶ 25–26.) Zou was again detained in September 1999, and, during her fifteen-day detention, was subjected to long hours of forced labor. (*Id.* ¶ 27.) She was detained again in November 1999 and spent all fifteen days of that detention handcuffed. (*Id.*) In February 2000, Zou began a period of detention in a forced labor camp that would last until December 28, 2001. (*Id.* ¶¶ 28–29.) During that time, she was subjected to forced labor, sleep deprivation, solitary confinement, and forced feeding. (*Id.* ¶ 28.) Upon her release, she was immediately sent to what she describes as a "[b]rainwashing [c]enter" for eight months, where she was deprived of sleep, forced to stay in uncomfortable positions for days on end, beaten, pricked, and burned. (*Id.* ¶¶ 29–31.) Zou alleges that she ultimately spent twenty months following her release from the forced labor camp in a series of brainwashing centers. (*Id.* ¶ 33.) At each one, Zou allegedly suffered both physical and psychological torture. (*Id.*) Like Chen,

2

Zou alleges that all of the abuses took place in China, primarily in her home province of Guangdong. (*See id.* ¶¶ 24, 29, 34.) The Complaint does not state how Zou came to reside in the United States.

Defendant is a citizen and resident of China. (*Id.* ¶ 54.) At the time Plaintiffs initiated this action, Defendant held positions as CCP Committee Secretary and Director of the Bureau of Reeducation through Labor of Guangdong Province. (*Id.*) Plaintiffs allege that the Reeducation through Labor ("RTL") system is the means by which Chinese authorities repress Falun Gong practitioners and that, as the director of Guangdong Province's RTL system, Defendant supervised and directed the RTL camps in which Plaintiffs were detained. (*See id.* ¶¶ 55–58.) Plaintiffs allege that Defendant's "responsibility and role were to specifically facilitate the commission of the wrongs" committed against them and that those wrongs would not have occurred had Defendant "chose[n] not to aid and abet the CCP." (*Id.* ¶ 60.) The crux of Plaintiffs' allegations is that, "[a]s the person in charge of the [RTL] system in Guangdong Province[,] . . . Defendant actively participated in formulating and carrying out the policies that resulted in the acts of arbitrary detention, torture, and execution that form the basis for [Plaintiffs' claims]." (*Id.* ¶ 63.)

B.  Procedural History

Plaintiffs, proceeding *pro se*, initiated this action on October 22, 2009 (Doc. No. 1) and served Defendant that same day, while he was visiting New York for official meetings (Doc. Nos. 2, 20). On December 17, 2009, after Defendant neither appeared nor answered, Plaintiffs applied for a default judgment. (Doc. No. 4.) That same day, the Court issued an order stating that it had received a letter from the Chinese Embassy urging that it dismiss the action pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, *et seq.* Because the law of the Second Circuit at that time interpreted the FSIA to immunize officials of foreign states who acted in their official capacities, *see In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 81 (2d Cir. 2008), *abrogated by Samantar v. Yousuf*, 130 S. Ct. 2278 (2010), the Court ordered Plaintiffs to show cause why the Court has jurisdiction, notwithstanding the FSIA, to enter a default judgment against Defendant. (Doc. No. 5.) Before Plaintiffs responded to the Order to Show Cause, however, the Court granted their motion to stay this action pending the Supreme Court's resolution of the scope of FSIA immunity in *Samantar v. Yousuf*. (Doc. No. 10.)

The Supreme Court decided *Samantar* on June 1, 2010, holding that an individual foreign official sued for conduct undertaken in his official capacity is not entitled to immunity under the FSIA. *See* 130 S. Ct. at 2292. The Supreme Court emphasized, however, that *Samantar* did not foreclose the possibility that such an official may be entitled to immunity under common law. *Id.* at 2292–93.

In light of *Samantar*, the Court issued Plaintiffs a revised Order to Show Cause why this action should not be dismissed on grounds of common law immunity. (Doc. No. 14.) Plaintiffs responded on August 20, 2010. (Doc. No. 17.) On August 26, 2010, the Court issued an Order permitting the Defendant or Chinese Embassy to file an opposition to Plaintiffs' submission by October 1, 2010. (Doc. No. 18.) The Court ultimately received two letters from the Chinese Embassy asserting immunity for Defendant. (Doc. No. 20.) One of those letters also included a legal memorandum from the Chinese Society of Private International Law, a non-party to this action,

3

arguing for the dismissal of this action on various grounds, including common law immunity, comity principles, and the inadequacy of Plaintiffs' allegations. (*Id.*)

In response to those submissions, and in keeping with established judicial practice, *see Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009), on June 23, 2011, the Court invited the United States Department of State to provide its views on the application of common law immunity to Defendant. (*Id.*) Although the State Department initially responded with a request for additional time to determine whether to make a submission, which the Court granted (Doc. No. 21), the State Department ultimately did not offer an opinion as to whether common law immunity shielded Defendant from liability in this action.

## II.  DISCUSSION

Plaintiffs bring this action under the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note), and the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, asserting causes of action for torture, genocide, violation of the right to life, arbitrary arrest and imprisonment, and violation of freedom of thought, conscience, and religion. Plaintiffs' allegations are uniformly serious and describe a system of repression and abuse abhorrent to principles of human rights and dignity. Nevertheless, the Court may not reach the merits of Plaintiffs' claims because it is clear from the Complaint that the Court lacks jurisdiction to do so. Not only does the Court not have personal jurisdiction over Defendant, but it lacks subject matter jurisdiction over Plaintiffs' ATS claims as well. Because the want of personal jurisdiction over Defendant is fatal to all of Plaintiffs' claims, the Court discusses that issue first. It then turns to the absence of subject matter jurisdiction over Plaintiffs' ATS claims.

### A.  Personal Jurisdiction

For purposes of deciding *sua sponte* whether to dismiss an action for lack of personal jurisdiction, courts in this circuit draw an "important distinction . . . between appearing and non-appearing parties." *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Grp.*, 619 F.3d 207, 213 (2d Cir. 2010). In cases involving the former, "a district court should *not* raise personal jurisdiction *sua sponte*." *Id.* However, when, as here, a defendant declines to appear and the plaintiff moves for default judgment, a court "may first assure itself that it has personal jurisdiction over the defendant" before it grants the plaintiff's motion. *Id.*

The Complaint alleges that Defendant resides in China (Compl. ¶ 54), and it asserts no connection between Defendant and the United States other than that he was present here as a "temporary visitor" (*id.* ¶ 5). In determining whether it may assert personal jurisdiction over Defendant, a non-domiciliary of New York, in a case involving a federal question, the Court must engage in a two-step analysis. First, the Court must determine whether the forum state's long-arm statute permits personal jurisdiction over Defendant. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). If it does, the Court must then determine "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Id.* at 164. The Court may exercise personal jurisdiction over Defendant only if it answers both questions affirmatively. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).

4

New York's long-arm statute provides that

> a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: [(1)] transacts any business within the state or contracts anywhere to supply goods or services in the state; or [(2)] commits a tortious act within the state . . . ; or [(3)] commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or [(4)] owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a). Given the posture of the instant case, the Court's inquiry is limited to whether the Complaint alleges any facts that would support personal jurisdiction under this statute. *See In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 468 (S.D.N.Y. 2010) ("Where no evidentiary hearing has been held, nor have the parties engaged in jurisdictional discovery, plaintiff's *prima facie* showing [of personal jurisdiction] may be established solely on the basis of legally sufficient allegations of jurisdiction." (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003))).

Having carefully considered the allegations in the Complaint, the Court finds that Plaintiffs have failed to plead facts that support personal jurisdiction under § 302. The statute's first, second, and fourth grounds clearly cannot apply because the Complaint contains no allegations that Defendant has engaged in commercial activity touching this state; committed tortious acts in New York; or owns, uses, or possesses any real estate here.

The third ground, covering tortious acts committed outside New York, applies only to acts that injure "person[s] or property within [New York]." Here, however, all of Plaintiffs' alleged injuries occurred in China while they resided there as Chinese citizens. As a legal matter, it is immaterial that Plaintiffs now reside in the United States and that at least Zou "continues to suffer from the memories" of her detention and torture.[2] (Compl. ¶¶ 8, 24, 35). For purposes of applying § 302(a)(3), "[t]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff." *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990) (internal quotation marks omitted); *see also Schenker v. Assicurazioni Generali S.p.A., Consol.*, No. 98 Civ. 9186 (MBM), 2002 WL 1560788, at *10 (S.D.N.Y. July 15, 2002) (distinguishing between "an original event (which necessarily occurs at a particular moment and may trigger the exercise of § 302(a)(3) jurisdiction) and the 'continuing' consequences of the original event (which occur 'over time' and can not [sic] trigger § 302(a)(3) jurisdiction)" (internal quotation marks omitted)).

Moreover, even if Defendant's actions could be said to have caused injury in New

---

[2] Plaintiffs do not in fact plead that they are now residents of New York State – they allege only that they reside in the United States – but the Court will assume that they are New York residents for the sake of argument.

York, Plaintiffs do not allege the requisite connection between Defendant and this forum. They allege only that, at some unspecified time, he will be a "temporary visitor" to New York. (Compl. ¶¶ 5, 7.) This tenuous and fleeting connection falls far short of the "persistent" and "substantial" relationship between a defendant and New York that § 302(a)(3) requires.

Accordingly, because none of the New York long-arm statute's provisions confers personal jurisdiction over Defendant, the Court must dismiss this action and need not consider whether exercising personal jurisdiction over Defendant comports with constitutional due process.[3] *See Best Van Lines*, 490 F.3d at 242 (stating that a court conducts the constitutional inquiry "[i]f, but only if," it finds jurisdiction under the forum's long-arm statute).

### B. Subject Matter Jurisdiction

The absolute requirement of subject matter jurisdiction provides an alternate basis for dismissing some of Plaintiffs' claims. "'It is a fundamental precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978)). Subject matter jurisdiction is thus "a threshold issue" in every case, *United Republic Ins. Co., in Receivership v. Chase Manhattan Bank*, 315 F.3d 168, 170–171 (2d Cir. 2003), and if it "is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action sua sponte." *Durant*, 565 F.3d at 62.

Here, even if the Court had personal jurisdiction over Defendant, it would lack subject matter jurisdiction to decide the majority of Plaintiffs' claims. As previously noted, Plaintiffs bring this action pursuant to the ATS and TVPA and assert claims for torture, genocide, violation of the right to life, arbitrary arrest and imprisonment, and violation of freedom of thought, conscience, and religion. Of these, only torture and possibly violation of the right to life are cognizable under the TVPA, which provides a private cause of action against "[a]n individual who, under actual or apparent authority, or color of law, or any foreign nation . . . subjects an individual to torture . . . or . . . to extrajudicial killing." *See* 106 Stat. 73. The remaining causes of action, alleging violations of rights recognized in international conventions and customary international law, are cognizable, if at all, only under the ATS. *See* 28 U.S.C. § 1350 (providing district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations").

Although the ATS was first enacted in 1789 and has been continuously in force ever since, *see* Act of Sept. 24, 1789, § 9, 1 Stat. 77, it has spent most of its history shrouded in both obscurity and mystery. *See Kadic v. Karadzic*, 70 F.3d 232, 236 (2d Cir.

---

[3] Nevertheless, the Court notes, in passing, that Plaintiffs' allegations are patently inadequate to establish that Defendant has the minimum contacts with New York necessary to satisfy constitutional requirements. *See Chloe*, 616 F.3d at 164 (explaining that the due process inquiry turns on "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction"); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (finding that the defendant's "one trip to [the forum state] . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . and thus cannot support an assertion of in personam jurisdiction over [the defendant as a matter of constitutional due process] by [the forum state's] court").

1995) (noting that the ATS has been "rarely invoked" since its enactment); *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) (describing the ATS as "a kind of legal Lohengrin"), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2689 (2010). In 2004, the Supreme Court took a step towards clarifying the ATS by holding that it is "strictly jurisdictional." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004). That is, the ATS "does not directly regulate conduct or afford relief," but "instead allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013). Nevertheless, after *Sosa*, the ATS's jurisdictional scope still remained unsettled. *Compare, e.g.*, *Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1015 (7th Cir. 2011) (finding jurisdiction under the ATS over suit alleging violations of international law on foreign soil), *with Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 74 n.3 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (noting that "no court of appeals has analyzed whether the ATS applies to conduct that took place in a foreign nation" and arguing that that question should be answered in the negative).

The Supreme Court squarely decided the scope of ATS jurisdiction only in its most recent term. In *Kiobel v. Royal Dutch Petroleum Co.*, former residents of the Niger Delta sued various foreign corporate entities under the ATS, alleging that those entities aided and abetted human rights abuses perpetrated by the Nigerian government. *See* 133 S. Ct. at 1662–63. Notwithstanding decisions of several circuits to the contrary, *see, e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), the Supreme Court held that the ATS does not create federal jurisdiction over violations of the law of nations that occur within the territory of a foreign sovereign, *Kiobel*, 133 S. Ct. at 1669.

Here, like the plaintiffs in *Kiobel*, Plaintiffs' alleged detention, torture, and abuse took place entirely abroad. The ATS thus does not provide the Court with jurisdiction over any of Plaintiffs' causes of action. Accordingly, the Court must dismiss all claims Plaintiffs bring under the ATS.[4]

III. CONCLUSION

Despite its dismissal of this action, the Court emphasizes that it is not senseless to the moral force of Plaintiffs' claims. The Court's discussion of personal and subject matter jurisdiction may strike Plaintiffs as legalisms, but those concepts are critical checks on the Court's power vis-à-vis its coordinate branches of government, the states, and individuals. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 (1985) (observing that the requirement of personal jurisdiction "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945))); *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (describing subject matter jurisdiction as "a restriction on federal power"). Whether the limits on federal jurisdiction are constitutional or

---

[4] The Court might still have subject matter jurisdiction over claims cognizable under the TVPA. Although the TVPA is "not itself a jurisdictional statute," the Second Circuit has interpreted it to permit plaintiffs to "pursue . . . claims of official torture under the jurisdiction conferred by the [ATS] and *also under the general federal question jurisdiction of [28 U.S.C. § 1331]*." *Kadic*, 70 F.3d at 246 (emphasis added). In any event, the absence of personal jurisdiction over Defendant renders Plaintiffs' TVPA claims a dead letter.

7

statutory, they represent democratic choices about the scope of the authority that judges may wield. *Cf. Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (observing that federal courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree" (citations omitted)). Those choices are the essence of what it means for citizens to be free. And much as the Court wishes to see Plaintiffs' human rights vindicated, its fundamental duty is to the principles of limited and lawful authority that are the pillars of democratic government.

Accordingly, for the foregoing reasons, the Court dismisses this action in its entirety. Because the dismissal is based on jurisdictional grounds, the Court does not reach the issue of whether Defendant is entitled to common law immunity for his alleged role in Plaintiffs' abuse. The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: August 1, 2013
       New York, New York

\*   \*   \*

Plaintiffs are proceeding *pro se*.

Defendant did not appear in this action.

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-1-13
```

8

Copies of this Order have been sent to:

Hua Chen
229 W. 28th Street
Suite 1200
New York, NY 10001

Yu Yun Zou
229 W. 28th Street
Suite 1200
New York, NY 10001

Embassy of the People's Republic of China
3505 International Place, NW
Washington, D.C. 20008

David Jones
United States Attorney's Office
Southern District of New York
david.jones6@usdoj.gov

9